**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EVARISTO CAMPO**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 20-1460-KSM** |
| **MID-ATLANTIC PACKAGING SPECIALTIES, LLC d/b/a MID-ATLANTIC PACKAGING,** | |
| Defendant. | |

## <u>MEMORANDUM</u>

Marston, J.                                                    September 29, 2021

Plaintiff Evaristo Campo has sued his former employer, Defendant Mid-Atlantic

Packaging Specialties, LLC d/b/a Mid-Atlantic Packaging ("MAP"), alleging that MAP

discriminated against him because he had diabetes and needed to take breaks to maintain his

blood sugar levels.  (Doc. No. 27.)  Campo—who was fired for violating company policy,

including failure to inform his supervisor before taking a break—seeks relief under the

Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA")

and asserts claims for disability discrimination, hostile work environment, retaliation, and failure

to reasonably accommodate.  (*Id.*)

MAP has filed a motion for summary judgment, arguing that Campo's disability

discrimination and retaliation claims must be dismissed because Campo cannot show that he was

terminated *because of his disability* and has not established pretext; that the failure to

accommodate claim fails because MAP reasonably accommodated Campo's disability by

allowing him to take breaks as long as he asked for permission first; and that dismissal of the

hostile work environment claim is warranted because the alleged harassment did not relate to Campo's disability and was not sufficiently severe or pervasive.  (Doc. Nos. 21-1, 23.)  Campo opposed the motion.  (Doc. Nos. 22, 24.)  The Court held oral argument on September 8, 2021.

For the reasons that follow, the Court grants summary judgment in favor of MAP on Campo's wrongful termination and hostile work environment claims.  Otherwise, MAP's motion is denied.

## I.     Factual Background

Taking the facts in the light most favorable to Plaintiff, the relevant facts are as follows.

### A.  *Campo's Work at MAP*

MAP produces corrugated cardboard, and its Montgomeryville, Pennsylvania facility includes a Display Plant and a Main Plant, the latter of which houses its corrugator.  (Doc. No. 21-2 at ¶¶ 3–5; Doc. No. 22-1 at p. 24 ¶¶ 3–5.)  A corrugator is a large machine—about the size of a football field—made up of a series of a smaller machines (*see* Doc. No. 21-2 at ¶ 6; Doc. No. 22-1 at p. 24 ¶ 6; *see also* Doc. No. 22-1 at p. 3 ¶ 15; Doc. No. 23-2 ¶ 15), and is meant to be constantly running (*see, e.g.*, Doc. No. 22-2, Ex. D, Hodges Dep. at 50:13–17, 52:20–24).  It combines two different kinds of paper to manufacture cut sheets of corrugated fiberboard.  (*Id.*; *see also* Doc. No. 22-2, Ex. C, Hinkle Dep. at 15:2–3 ("Corrugator makes flat sheets of paper that are then transformed into a box.").)

Campo began working for MAP in 1988.  (Doc. No. 21-2 at ¶¶ 1, 4; Doc. No. 22-1 at p. 24 ¶¶ 1, 4.)  During his 32-year tenure at the company, Campo was a member of the United Steelworkers, Local 8286 (the "Union") and worked as a Material Handler at the corrugator at the Main Plant.  (Doc. No. 22-1 at p. 1 ¶ 1 & p. 29 ¶ 44; Doc. No. 23-2 at ¶¶ 1, 44.)  In that capacity, Campo was responsible for driving the forklift and operating a smart cart, meaning that

he was responsible for unloading stock from the corrugator and moving it to trailers or the production line.  (Hodges Dep. at 28:9–14, 55:3–12; *see also* Doc. No. 21-2 at ¶¶ 33–34, 38–39; Doc. No. 22-1 at p. 28 ¶¶ 33–34, 38–39; Doc. No. 22-2, Ex. A, Campo Dep. at 25:19–26:1.) Campo worked the first shift, which typically ran from 6:00 a.m. to 2:00 p.m.  (Doc. No. 21-2 at ¶¶ 33, 36; Doc. No. 22-1 at p. 28 ¶¶ 33, 36; *see also* Doc. No. 22-1 at p. 3 ¶ 19; Doc. No. 23-2 at ¶ 19.)  Under the Union's Collective Bargaining Agreement (the "CBA"), Campo was entitled to two 10-minute breaks plus a 15-minute break for lunch during his shift.  (Doc. No. 21-5, Ex. J at p. 87.)[1]

### B.   MAP Is Acquired

In November 2018, MAP was acquired by the Royal Group/Schwartz Partners.  (Doc. No. 22-1 at p. 5 ¶ 31; Doc. No. 23-2 at ¶ 31.)  A few months after the acquisition, in February 2019, MAP began producing food packaging and enacted Hygiene Requirements to become food safety compliant and avoid contamination of the packaging.  (*See* Doc. No. 21-5, Ex. G; *see also* Hodges Dep. at 11:3–16, 12:5–7.)  The rules prohibited employees from bringing food or non-water drinks outside of the breakroom, into the manufacturing and warehouse areas; rather, employees were only permitted to bring water into those areas "in a clear, colorless, plastic container with a closeable lid."  (Doc. No. 21-5, Ex. G at p. 2.)  Pursuant to the rules, employees were not allowed to wear jewelry or bring personal effects onto the floor.  (*Id.*)  These rules existed in addition to the company's longstanding Plant Rules and Guidelines.  (*See* Doc. No. 21-5, Ex. H.)  The Plant Rules outlined examples of "prohibited conduct and behavior," including "failing to observe safety rules, procedures and policies," "failing to properly observe working

---

[1] The CBA also provides for a progressive disciplinary policy, which means that a Union employee receives a verbal warning, written warning, suspension, and then termination.  (Doc. No. 22-3, Ex. E, Jones Dep. at 15:18–16:22.)

hours . . . [and] leaving the job without notification," and "refus[ing] to follow the safe and lawful directions of Company management." (*Id.* at p. 5.)

Further, MAP's Employee Handbook delineated proscribed conduct; it described the company's progressive discipline policy and behavior that could lead to disciplinary action, including "insubordination, chronic lack of cooperation, and poor attitude," "disregard of housekeeping and safety rules," and "violation of Company policy or work rules." (Doc. No. 21-5, Ex. I at pp. 66–67; *see also id.* p. 52 ("The Company may implement work rules at its discretion pertaining, but not limited to, safety, dress and job performance. Employees are expected to comply with all work rules implemented by the Company; failure to do so may result in disciplinary action, up to and including termination.").)

After the acquisition, in late January 2019, the Display Plant Superintendent, Marvin Hinkle, was transferred to the position of Corrugator Superintendent. (Doc. No. 21-2 at ¶ 27; Doc. No. 22-1 at p. 28 ¶ 27.) In that role, Hinkle was responsible for corrugator production and supervised the employees who worked on the corrugator. (*See* Doc. No. 22-2, Hinkle Dep. at 14:14–23 ("I make sure everybody shows up. I make sure everybody is doing their job. I make sure everybody is where they're supposed to be. I make sure everybody is following the rules, safety rules . . . I make sure the machine runs the way it's supposed to, we're making the correct product, we're making good product and the guys are doing it safely basically."); Hodges Dep. at 101:1–12 ("[Hinkle's] responsible for the first shift corrugator production, and ultimately the second shift corrugator production, not so much in their output, but in reviewing what their data looks like, was it recorded correctly, how are they performing. The day-to-day first shift operations, he's involved directly in everything from the mechanical issues to the run speeds, safety on the machine, you know, is everybody compliant.").) As Corrugator Superintendent,

Hinkle also began conducting weekly safety meetings.  (Doc. No. 21-2 at ¶ 29; Doc. No. 22-1 at p. 28 ¶ 29.)  Attendance at these meetings was mandatory.  (Doc. No. 21-2 at ¶ 30; Doc. No. 22-1 at p. 28 ¶ 30.)  Although the topics often changed week-to-week, some topics—such as the importance of wearing personal protective equipment, glasses, safety shoes, and not donning any jewelry—were discussed at every meeting, given their importance.  (Doc. No. 21-2 at ¶¶ 31–32; Doc. No. 22-1 at p. 28 ¶¶ 31–32.)

### C.  *Campo's Working Environment Changes After Hinkle Becomes His Supervisor*

Campo began reporting directly to Hinkle[2] when Hinkle became the Corrugator Superintendent; before that, Campo reported to Curtis Peace, the former First Shift Corrugator Supervisor.  (Doc. No. 21-2 at ¶¶ 68–70; Doc. No. 22-1 at p. 31 ¶¶ 68–70.)  According to Campo, everything changed for the worse after the takeover of the company and once Hinkle became his supervisor.  (*See, e.g.*, Campo Dep. 33:20–23; Doc. No. 21-6, Ex. T at p. 7.)

Campo was diagnosed with diabetes approximately three or four years ago, and needs to take breaks to eat a snack or take his medicine so that he can maintain his blood sugar levels.  (*See, e.g.*, Campo Dep. at 54:20–23, 56:3–5, 121:12–19, 122:9–16.)  Because food is not allowed on the production floor, Campo needed to leave his post at the corrugator to eat his snacks.  (*Id.* at 29:23–30:2; *see also* Hodges Dep. at 98:14–20.)  Campo alleges he first told Hinkle about his diabetes when they were in the break room, shortly after the takeover, and said he needed to take breaks to control his blood sugar.[3]  (Campo Dep. at 22:5–23:4; *see also id.* at 123:18–124:4.)

---

[2] In terms of hierarchy, Joe Hodges is the Operations Manager; below him is the plant manager, Jim Brennan, who oversees production in the Display Plant and Main Plant; and below Brennan is Hinkle, as Corrugator Superintendent, and the remaining production supervisors.  (Hodges Dep. at 9:12–13, 14:19–15:6.)

[3] Before Hinkle became Campo's supervisor (i.e., when Peace still supervised Campo), Campo did not notify anyone at MAP regarding his diabetes diagnosis because he never had any issues taking a break to eat a snack or go to the bathroom.  (*See, e.g.*, Campo Dep. at 24:21–23 ("The time that I've been working

Ultimately, MAP agreed that Campo could take breaks as needed because of his diabetes. (*Id.* at 56:6–8.)  However, Campo was directed to notify someone whenever he left his post. (*See, e.g.*, *id*. at 24:1–9 ("Q: [W]hen an employee who is working on the corrugator has to leave his post for whatever reason, it is a fact and a policy that he has to tell a supervisor or someone that he's leaving his post; isn't that right? A: Yes."); *id.* at 27:2–9, 28:14–21; *see also* Hinkle Dep. at 68:21–23 ("[H]e was allowed more breaks as long as he told someone that he needed to go."); Doc. No. 21-6, Ex. V at p. 19 ("We communicated to EC [Campo] that he is allowed to take such breaks as long as he notifies someone . . . [T]his [notification requirement] is the expectation for everyone.").)

The company wanted to know where all of its employees were for safety reasons and so that it could ensure that the production ran smoothly.  (Campo Dep. at 26:12–20; *see also* Doc. No. 22-3, Ex. F, Westby Dep. at 66:24–67:7, 73:14–74:9, 122:1–124:9.)  However, Campo believed that it was a "waste of time to go looking for [Hinkle]."  (Campo Dep. at 53:18–54:1*; see also id.* at 80:22–81:2 ("[T]he supervisor is never around when I need to take a break like this.  And, you know, I can't help it if he's not around.  I would have to go all the way to the office in order to tell him.").)  In addition, although Campo understood that he needed to tell people where he was going, he felt that the policy was unfairly applied to him.  (*Id.* at 86:8–19, 87:16–23, 130:20–132:19.)

Campo testified that Hinkle would speak to him in a "very grotesque manner," "[l]ike a humiliating manner," as if "[Campo] was beneath him."  (*Id.* at 43:15–46:3; *see also id.* at 125:12–21 ("Q: And what did [Hinkle] say that [was] inappropriate?  A: Verbal abuse . . . [H]e

---

there before this change, no one had to ask for permission."); 122:17–22 ("Q: Do you recall being disciplined by the company before Marvin Hinkle was your supervisor for taking what they claimed to be unauthorized breaks?  A: I never had any complaints from anyone."); 123:24–124:4.)

would speak to me in a very grotesque way, and he would constantly be telling me with a very bad demeanor that I couldn't be in certain places.  Q: Do you recall anything specific that he said?  A: That I couldn't eat my snack without permission.").)  For example, Hinkle would say "[i]n a very humiliating way, like pick that up.  Put it there."  (*Id.* at 46:4–6.)  Campo testified that Hinkle "would be like checking off, like checking my work.  He would be like harassing me, like stalking me.  Like he would be behind me while I was working.  Like with this demeanor of like I'm not doing what I have to do or right.  I would go on my breaks and he would follow me throughout the entire place."  (*Id.* at 44:15–25; *see also id.* at 30:15–23 ("He would be spying on me.  Like he would hide.  He would see what I'm doing.").)  In sum, Hinkle would scrutinize Campo's work.  (*Id.* at 45:4–10 ("Q: [S]o that's what you're claiming was scrutiny of your work, as I understand it?  A: Yeah.  Like he was always trying to see what he could write me up on, like to see if he could catch me doing something wrong so he could write me up on it.").)

### D.  Campo Begins Receiving Discipline and Warnings, and Visits His Doctor Due to the Stress of His Work Situation

A little over a month after Hinkle became Campo's supervisor, Hinkle completed a Disciplinary Action Form, indicating that Campo had failed to follow instructions.  (Doc. No. 21-5, Ex. P at p. 134.)  The form, completed on March 8, 2019, states:

> Campo loaded WIP [Work in Process] units into a trailer Friday march [sic] 8th without scanning them to the trailer.  This caused the display plant to waste time looking for the unit [sic] the corrugator ran but wasn't scanned to any location.  All units need to be scanned or we wind up coming up short on the job when it is converted and doing a make up when the unit pops up at a later day and time.

(*Id.*)

Hinkle indicated that he would "explain to Campo once again the importance of scanning units to the trailers."  (*Id.*)  Campo testified that he has "never not scanned any of the units" and instead blamed the issue on "a printing problem."  (Campo Dep. at 50:19–24; *see also id.* at

51:18–22, 52:20–24.)

Then, the next month, on April 3, Campo received a verbal warning for taking an

unapproved break.  (*See* Doc. No. 21-5, Ex. M at p. 128 (Notice of Discipline); *see also* Doc. No.

21-6, Ex. U at p. 10; Doc. No. 21-7, Ex. AF at p. 14 (Disciplinary Action Form).)  The verbal

warning states:

> You were observed in the back of the break room by the Corrugator
> Superintendent at 7:20 a.m. taking an unauthorized break.  At the time the
> Supervisor needed units loaded into a trailer and couldn't find you on the floor at
> your regular work station.  You are known to typically take your 10-minute break
> between 8:00 a.m. – 8:30 a.m. to ensure proper coverage.

(Doc. No. 21-5, Ex. M at p. 128.)  The Notice of Discipline informed Campo, "Effective

immediately, you are expected to have no further unapproved breaks.  If you require a break

outside of your normally scheduled time for any reason you must inform your supervisor so your

job can be properly covered."  (*Id.*)  In addition, the warning advised Campo that he would

"receive further disciplinary action if [his] behavior is not modified or expectations are not met."

(*Id.*)  Hinkle and Jones both signed the Notice of Discipline; however, Campo refused to sign.

(*Id.*)  According to Campo, the incident recounted in the Notice is "a lie."  (Campo Dep. at

56:22–24.)

Less than a week later, on April 9, Hinkle sent an email to Jones about Campo "[f]or

informational purposes."  (Doc. No. 21-7, Ex. AD at p. 10.)  Hinkle told Jones that he had seen

Campo "chewing gum on the floor today and also wearing a gold chain around his neck."  (*Id.*)

Hinkle said that he "reminded Campo that both chewing gum and jewelry aren't allowed on the

production floor and asked him to please get rid of both."  (*Id.*)  Hinkle noted that he "used these

two instances to remind Campo of the rules and . . . didn't do any discipline actions" at that

point.  (*Id.*)

The next month, on May 30, 2019, Campo received a doctor's note from his provider at

Holy Redeemer Healthcare, which stated that he needed "multiple meal breaks throughout work day.  Due to Diabetes."  (Doc. No. 22-3, Ex. J at p. 99.)  Campo testified that he gave the note to Erik Jones in Human Resources at that time, though MAP has no record of the May 30 note on file.  (Campo Dep. at 71:22–72:8.)[4]

Then, on June 25, 2019, Campo received a written warning for being away from his work area without receiving prior approval.[5]  (Doc. No. 21-5, Ex. N at p. 130; *see also* Doc. No. 21-6, Ex. U at p. 10; Doc. No. 21-7, Ex. AG at p. 16 (Disciplinary Action Form).)  The written warning describes the incident, which occurred on June 6, and states:

> At 6:03 a.m. there were DP units that needed to be loaded onto the trailer, but Supervision could not find you in your work area.  An operator on the machine was asked if they saw you and they did not.  You were observed walking towards the building to come to the shipping area at 6:12 a.m.  When approached for an explanation of not being at your work area your responses were very flippant and dismissive.

(Doc. No. 21-5, Ex. N at p. 130.)  The Notice of Discipline reiterated the need for Campo to inform his supervisor anytime he took a break outside of his normally scheduled time and warned that he would be subject to further disciplinary action if he continued his behavior.  (*Id.*) Both Hinkle and Jones signed the Notice but Campo again refused to sign.  (*Id.*)  Campo testified that Hinkle's version of events, as outlined in the Notice, is "not what happened" and is a "lie." (Campo Dep. at 57:24–58:15 ("All of these things he's putting down are lies.  He just wants to find a way for me to lose my job.").)

---

[4] Hinkle testified that he never saw the May 30 doctor's note (Hinkle Dep. at 158:12–18), and Jones testified that he did not recall receiving any doctor's notes around that time (Jones Dep. at 105:7–22).  To that end, Hinkle testified that he did not become aware of Campo's diabetes until "the very end," towards the end of the disciplinary process, close to Campo's first termination.  (Hinkle Dep. at 65:22–66:8, 67:2–9, 84:21–86:9.)

[5] The company also indicated in its description of Campo's "work history" that Campo received a verbal warning for conduct that occurred on June 13, 2019.  (*See, e.g.*, Doc. No. 21-6, Ex. U at p. 10.)

The next day, on June 26, Hinkle emailed Jones about Campo, again for informational purposes.  (Doc. No. 21-7, Ex. AE at p. 12.)  Hinkle explained that during a "safety audit" he completed that morning, he observed Campo "wearing jewelry again (wedding ring)," "asked him to remove it," and "went over the no jewelry policy with him again."  (*Id.*)  Hinkle added, "This is about the 5th time I have seen him with jewelry on and had to ask him to remove it . . . I just wanted to note the conversation I had with him today because any further issue with Campo and the violation of the no jewelry policy will result in write ups."  (*Id.*)

About two months later, on August 21, Campo received a final written warning for allegedly taking an unauthorized break on August 15.  (Doc. No. 21-5, Ex. O at p. 132; *see also* Doc. No. 21-6, Ex. U at p. 10.)  The final written warning states:

> On August 15th you were observed taking an unauthorized break.  Your supervisor, Marvin Hinkle went to the employee break room at 10:30 a.m. to speak with another supervisor, Miguel DeJesus.  It was at that moment that Marvin observed you sitting in there eating a peach and taking an additional break with no notification to anyone.  With Miguel DeJesus present Marvin asked you why you were in the break room taking a break when your break time isn't for another half an hour and you responded, 'This isn't a break I'm just eating fruit.'  Your next scheduled break was at 11 a.m.  This incident is similar to your actions on 4/3/19 and 6/6/19 that you received a Verbal Warning and Written Warning for respectively.  This is another clear violation of the Plant Rules and Regulations[.]

(Doc. No. 21-5, Ex. O at p. 132; *see also* Doc. No. 22-3, Ex. L at pp. 108–09.)

The Notice of Discipline reiterated the need for Campo to inform his supervisor anytime he took a break outside of his normally scheduled time and warned that he would be subject to further disciplinary action if he continued his behavior.  (Doc. No. 21-5, Ex. O at p. 132.)  Both Hinkle and Jones signed the Notice but Campo again refused to sign.  (*Id.*)  Campo testified that the description of events in the Notice is "[c]ompletely false."  (Campo Dep. at 79:2–10.)  According to Campo, the Notice is a lie "because they make it sound like I'm taking my break to rest.  I'm not.  I'm just real quickly eating my fruit so I could take my medicine."  (*Id.*)

Campo provided MAP with a second doctor's note, dated August 15, 2019, from Holy Redeemer Healthcare, which states: "Mr. Evaristo Campo is a patient in my medical practice with diabetes. It is because of his medical condition that Evaristo may need frequent breaks to eat along with his lunch break to include 3 meals and 3 snacks a day." (Doc. No. 21-6, Ex. S at p. 4.)

Also on August 21, 2019, Campo received a verbal written warning for wearing jewelry on the production floor two days prior. (Doc. No. 21-5, Ex. Q at p. 136; *see also* Doc. No. 21-6, Ex. U at p. 10.) The warning states:

> On Monday, August 19th at approximately 11:30 a.m. you were observed wearing jewelry in the Manufacturing & Warehouse area[.] [MAP] has made a significant investment in both capital and labor hours to become Food Safety certified. A critical component of that certification is the established policies and procedures related to hygiene and PPE . . . You have been informally counseled several times about wearing jewelry in the past and have been given tremendous leeway in spite of your effort to change your behavior. This incident is a clear violation of the Hygiene and PPE Requirements[.]

(Doc. No. 21-5, Ex. Q at p. 136.) Both Hinkle and Jones signed the Notice but Campo once again refused to sign. (*Id.*)

### E.  Campo Complains that Hinkle Is Harassing Him

On August 29, 2019, Campo filed a grievance form against Hinkle, stating that he was "[b]eing harassed for eating small snacks (In the lunchroom) to maintain my diabetes." (Doc. No. 21-6, Ex. T at p. 6.) Campo filed the grievance form so that MAP and Hinkle would "stop the harassment and allow [him] to eat to maintain [his] sugar levels." (*Id.*) In addition, Campo wrote a grievance letter, in which he described in greater detail the many issues he experienced under Hinkle's supervision. (*See generally id.* at pp. 7–8.) Campo began by explaining that he "generally . . . [has] not had disciplinary issues with previous supervisors or harassment problems" in his 32 years "as a fork lift driver/operator," but that changed once Hinkle "was

11

transferred to our plant." (*Id.* at p. 7.)

Campo noted that because of his diabetes diagnosis, he is "supposed to eat small frequent meals 5 times a day," and that he turned a doctor's note to this effect into the office and that "none of [Campo's] previous supervisors had an issue with this." (*Id.*) Hinkle "asked that [Campo] ask permission each time [he] need[s] to step away to eat and/or use the bathroom directly to him and only him," and Campo claimed that "[i]t has gotten to the point that he comes in to [sic] the bathroom to check that I am in fact using the facility." (*Id.*) According to Campo, Hinkle followed him into the bathroom and "around the plant constantly" and "asked other supervisors to come check on what I am doing as if he is looking for the opportunity to look for a disciplinary action against me." (*Id.*) According to Campo, Hinkle had also harassed employees when he worked as a Superintendent at the Display Plant, prompting his transfer to the Main Plant. (*Id.*)

Campo also alleged that Hinkle was also "embarrassing [him] in front of [his] co-workers" by yelling "Now get out of here!" at him at the end of a meeting, and had "a personal vendetta against" him. (*Id.*) Campo recounted the most recent incident, which had taken place on August 27; that day, Hinkle called Campo over while Campo "was in the middle of a job," Campo "responded [by] telling him I would be there in a minute," and Hinkle "aggressively yelled at [him]," stating "if you don't want to work, you can go home." (*Id.*) Campo explained that he has become stressed and depressed, worries constantly, and has lost sleep and his appetite "out of worry [over] what could happen next with Marvin." (*Id.* at p. 8.)

Jones investigated Campo's complaint that Hinkle had harassed him. (*See* Doc. No. 21-6, Ex. U at p. 10; Jones Dep. at 52:8–12, 60:13–19.) Jones asked Miguel DeJesus, a Converting Supervisor in the Main Plant who also worked the first shift, whether Hinkle ever asked him to

follow Campo around the facility. (*Id.*) DeJesus told Jones that although Hinkle has asked him if he knows where Campo is or has seen Campo, Hinkle has never asked him to follow Campo. (*Id.*) Jones also asked Kevin Russ, the Shop Steward and Union representative, if he ever received complaints from employees when Hinkle worked at the Display Plant, and Russ responded that he had not. (*Id.*) In addition, according to Jones's investigation notes, Human Resources never received any other harassment allegations against Hinkle. (*Id.*; *see also* Doc. No. 22-3, Ex. H at p. 92 ("Plaintiff is the only employee who has made a legal complaint against Mr. Hinkle during the specified time period.").) Last, Jones asked an anonymous corrugator crew member how things had been going since Peace, the previous Corrugator Supervisor, had left, and the crew member "smiled and said everything is running much better and the crew is happier." (*Id.*)

Jones ultimately concluded that Campo had not been harassed. (*See, e.g.*, Jones Dep. at 58:20–23 ("Based on my investigation . . . it didn't seem the harassment claims were legitimate."); *see also id.* at 135:11–136:2, 154:18–20.)

### F. The September 6 Incident

On Friday, September 6, 2019, Hinkle emailed Jones about another incident that had transpired that morning. (*See* Doc. No. 21-6, Ex. V at pp. 12–20.) In the email, Hinkle informed Jones that

> [a]t 5:30am I was looking for Campo but couldn't find him. I needed the chop cart emptied so I could put it back in the machine because the machine will not run without it being plugged in. I looked through shipping and on the smartcarts but he wasn't there so I jumped on the forklift and emptied it myself to keep the machine going.

(*Id.* at p. 18.) Hinkle added that when he saw Campo later, he said "campo [sic] I was looking for you at 5:30 this morning because I needed the chopout cart emptied and he looked at me like I was being ridiculous[.]" (*Id.*) Hinkle ended the email by asking advice on how to proceed:

"Erik/Joe this is another instance where Campo knows what he is supposed to do and what is required of him but he doesn't do it and does what he wants to.  Does his pay get docked for 15min. today?  Do I write him up again?  Do I give him yet another warning?  Or is this the final straw?"  (*Id.*)[6]

Erik Jones forwarded Hinkle's initial email to Steve Westby,[7] who proposed that Hinkle, Jones, and Hodges call Campo to discuss the incident.  (*Id.* at p. 17.)  In Westby's view, "[w]hat [Campo] did today is not related to his diabetic condition . . . We have repeatedly admonished him for being away from his work area w/o notifying us or w/o permission.  Today appears to be 'more of the same.'"  (*Id.*)  Hinkle clarified that when he asked Campo "why he wasn't at his job position," Campo "said he was going around the building turning on the fans."  (*Id.* at p. 16.)  However, according to Hinkle, "[w]hen I saw him at 5:43 none of the fans were on at that time and he was coming down the side of the EMBA from the front of the building (breakroom/bathroom area) where there aren't any fans… he proceeded to turn the fans on when I was checking his clock in time, he was not doing this from 5:30 – 5:43 when I saw him[.]"  (*Id.*)

At the end of Campo's shift, Jones met with Campo and documented the meeting.  (Doc. No. 21-6, Ex. W at pp. 22–23; *see also* Doc. No. 21-6, Ex. V at p. 15.)  According to Jones's notes, he began the conversation by asking Campo for more details on his harassment allegations.  (Doc. No. 21-6, Ex. W at p. 22.)  For example, Jones asked Campo when Hinkle

---

[6] Campo disputes Hinkle's iteration of the events.  Campo testified:  "That's not true.  They're not fans.  They're ventilators.  And he's lying . . . And every morning at 5:30 sharp I turn on the ventilators because the smoke from the corrugators is so strong that it makes it difficult to see and it smells really bad."  (Campo Dep. at 82:12–18.)

[7] Westby is the Director of Employee Relations for Schwarz Partnerships, which has an ownership interest in MAP.  (Westby Dep. at 11:2–11.)

followed him into the bathroom, and Campo replied, "I don't have dates" but thought it happened "twice" and started "3 weeks ago maybe." (*Id.*)  When Jones asked which supervisors Hinkle had follow him, Campo responded, "I won't name names." (*Id.*)  Likewise, when Campo said that employees in the Display Plant complained about Hinkle and his behavior/harassment, Jones asked for names and Campo "again refused to name names." (*Id.*)

When they discussed the incident from the morning, Campo explained that he was "turning the fans on and getting everything ready for the day." (*Id.*)  According to Jones's notes, Jones "reiterated the expectations of notifying his supervisor when he leaves his job.  In specific response to his grievance to harassment of eating small snacks. [sic] 'as we said in your last disciplinary meeting, we have no problem allowing breaks as needed to eat, but you need to let supervision know.'  I asked him to acknowledge he understood and he did." (*Id.* at p. 23.)

After the weekend, Jones met with Campo on Monday morning, September 9, and sent him home while the company deliberated on what further action to take.  (Doc. No. 21-6, Ex. V at pp. 12–14.)  In their deliberations, Jones espoused his view that "[t]he current disciplinary actions are not correcting his behaviors and attitude toward management/TRG.  I think we are all willing to do whatever is necessary to correct, although I don't believe Campo is WILLING to correct.  And if he is not willing to change than [sic] I think it might be best for all parties to go separate ways." (*Id.* at p. 12.)  Hinkle agreed, chiming in:

> This has been a [sic] ongoing process with many meetings with Campo and the union over many months, in every single one of those meetings Campo has been very argumentative and refuses to change his behavior.  Campo says very bluntly he will not change the things we have him asked to [sic] because he isn't a kindergartner and doesn't need to report his every move to anyone . . . My opinion and recommendation is to stand strong and move on from Campo[.]

(*Id.*)

Meanwhile, Campo visited his doctor the next day, September 10, and reported increased

stress due to Hinkle's treatment of him.  (Doc. No. 22-3, Ex M at p. 116 & Doc. No. 21-6, Ex. R

at p. 2.)  The doctor noted that Campo was experiencing "[s]tress at work" and was

"symptomatic" and diagnosed him with post-traumatic stress disorder ("PTSD").  (*Id.*)  The

doctor also wrote that Campo

> [p]resents c/o increased stress associated with mistreatment from his supervisor
> who started to work at his plant about 2 months [sic].  States he is fighting him on
> issues which are medically related, (ie patient has DM and needs to eat at times to
> avoid the sugar from being too low) and he feels he is being discriminated
> against.  Patient has been working this job x [sic] the past 31 years and it wasn't
> until this supervisor started at his plant that he has been with [sic] this problem.
> States he follows him all around including the bathroom, andis [sic] feeling
> extremely stressed.  Is with difficult with getting to sleep and will wake up in the
> middle of the night with anxiety.  He feels the supervisor is trying to bait him to
> get angry so he has a reason to cite him.  Is not eating and is loosing [sic] weight.
> Patient even spoke to Dr Matthews who gave him a medical necessity note so he
> is able to eat as needed and yesterday he was in a side room eating a snack and the
> supervisor told him that he is not suppose[d] to leave without checking with him
> and now he is suspended.

(*See* Doc. No. 21-6, Ex. R at p. 2; *see also id.* (listing "mental status" as "anxious, depressed, and

agitated").)

### G.  Campo Is Terminated for the First Time (the "First Termination")

On September 11, 2019, MAP terminated Campo.  (Doc. No. 21-6, Ex. X at p. 25.)  The

Notice of Discipline states:

> Since April 3, 2019 you have been warned three times regarding your attitude and
> behavior towards following supervision direction and leaving your work area
> without notification.  You have warned for two other [sic] noncompliance in that
> time.  In every single one of those disciplinary meetings you were argumentative
> and g[a]ve the impression that you refuse to change your behavior . . . We have
> repeatedly asked you to tell a supervisor when you are leaving your work area and
> we have yet to receive such notifications.

(*Id.*)  The Notice went on to describe "[t]he most recent example," which occurred on September

6, when Campo was not in his position and claimed he was turning on the fans.  (*Id.*)

Campo immediately grieved his termination, stating that he was wrongfully terminated

and seeking reinstatement and "backpay for missed days."[8]  (Doc. No. 21-6, Ex. Z at pp. 29–30.)
The grievance was denied.  (*Id.* at p. 30 ("Denied.  Company position stands from meeting with
Union reps on 9-11-19.").)

Shortly thereafter, on September 23, Campo filed a Charge of Discrimination with the
Equal Employment Opportunity Commission ("EEOC"), alleging that he was discriminated
against on the basis of his disability and his age, that he was retaliated against, and that MAP
failed to accommodate his disability.  (Doc. No. 21-6, Ex. Y at p. 27.)

### H.  Campo Comes Back to Work Pursuant to a Last Chance Agreement

On October 18, 2019, Campo, MAP, and the Union signed a Last Chance Agreement
("LCA"), pursuant to which Campo's employment was reinstated, subject to certain conditions.
(Doc. No. 21-7, Ex. AA at p. 2.)  The Agreement begins by outlining Campo's prior misconduct:

> The employee is being considered for dismissal due to the following behaviors:
> Being away from work area without permission on September 6th when needed by
> Supervisor; Unauthorized break on August 15th; Unauthorized break on June 6th
> when units needed to be loaded; Unauthorized break on April 3rd when units
> needed to be loaded.  During this time Evaristo Campo also received warnings for
> wearing jewelry on the floor.  Instead of terminating employment, Evaristo
> Campo's time away from work since termination on September 9, 2019 will be
> considered suspension from work without pay.

(*Id.*)

The Agreement further states:

> The employee understands that this agreement is his last chance to remain

---

[8] Defendant's position during Campo's deposition regarding back pay is confusing.  (*Compare* Campo
Dep. at 106:7–16 ("Q: You got your back pay, right, Mr. Campo?  A: I don't remember.  Q: Well, would
you have agreed to go back to work if they hadn't paid your back pay?  I would think that would have
been part of the deal.  A: I can't remember.  My memory is not that good.  I can't remember if I did or
not.  Q: Well, I'll represent to you that you did."), *with* Rough Drft. Hr'g Tr. at 18:7–8 (defense counsel
stating, "[Campo] comes back with a last chance agreement.  No back pay, which is sort of interesting,
but he comes back"); Doc. No. 21-2 at ¶ 202 ("Plaintiff's employment with Defendant was reinstated,
without back pay, per the terms of the LCA on October 30, 2019.").)  The Last Chance Agreement
indicates that Campo did not receive back pay.  (*See* Doc. No. 21-7, Ex. AA at p. 2 ("Instead of
terminating employment, Evaristo Campo's time away from work since termination on September 9,
2019 will be considered suspension from work without pay.").)

employed at [MAP].  Failure to make improvement or recurrence of inappropriate behavior or conduct will result in immediate termination.  The Company will continue to accommodate certified medical conditions as is appropriate, so long as we are notified of the need so we can arrange a replacement and know where the employee is.

(*Id.*)  As a condition of his reemployment, Campo also "agree[d] to comply with all company policies, practices and procedures" and indicated that he "underst[ood] that this agreement in no way prevents the employer from taking disciplinary action, including termination, for violations."  (*Id.*)

Campo claims that he was pressured into signing the LCA.  (*See* Doc. No. 22-3, Ex. G, Plf.'s Resp. to Interrog. #4 at p. 87 ("Plaintiff was permitted to return to work, effective in or about October 2019, however as a condition of his reinstatement, Plaintiff was pressured to sign a 'Last Chance Agreement,' which . . . was also discriminatory and in retaliation for his complaints of disability discrimination and retaliation [sic] because other non-disabled employees who have been reinstated have not been asked to sign the same or similar agreement."); *but see* Campo Dep. at 115:13–17 ("Q: You indicated in your responses to certain questions that you were pressured into signing your last chance agreement.  Who pressured you?  A: No one pressured me.").)

### I.  *Campo Is Terminated for a Second Time (the "Second Termination")*

On December 13, 2019, Campo was terminated for a second time.  (Doc. No. 21-7, Ex. AB at p. 4.)  The Notice of Discipline gave three reasons for his termination:

- On Friday, November 1st, you failed to unload stock off trailer for WIP.  You proceeded to unload stock off the Corrugator line onto the production floor and tagged the units 'no trailer space available.'  The WIP lines had plenty of available space.

- On Wednesday 11/27/19 you took a 25-minute break on what was supposed to be a 10-minute break starting at 1pm.  Kevin Russ (shop steward) happened to be standing with Marvin upon your return and both Kevin and Marvin had a discussion with you about your breaktimes and the length they are supposed to

be.

- On Friday, 12/6/19 you were found to have violated [the company's] Hygiene Requirements by having coffee on the production floor.

(*Id.*; *see also* Doc. No. 22-3, Ex. Q at p. 142 (December 6, 2019 email from Hinkle to Jones ("Today Campo was seen by me walking to the smart cart with a cup that isn't a clear container like it is supposed to be and it was filled with coffee.  This is yet another violation of the food safety rules.")); *id.* at p. 141 ("Erik I would also like to add that Wednesday 11/27/19 campo [sic] took a 25 minute break on what was supposed to be a ten minute break . . . So to sum this up since Campo has returned we have had 2 instances where Campo has been given a break for the exact same reasons he was terminated for previously . . . And now we have a 3rd instance where [he] is violating the food safety policy again[.]").)  Campo claims that those reasons are all false.  (Campo Dep. at 107:15–109:18.)

After the December 6, 2019 incident, in the lead up to his termination, Hinkle emailed Jones:  "Following all rules including food, drinks on floor plus abusing breaks are all clearly stated in his last chance agreement.  Total disregard for policy is and always has been a problem with him."  (Doc. No. 22-3, Ex. Q at p. 143.)

Campo grieved his second termination, claiming that he had not been given a chance.  (Doc. No. 21-7, Ex. AC at pp. 7–8.)  The grievance was rejected.  (Doc. No. 22-3, Ex. R at p. 150 ("Rejected.  The grievance is both inaccurate and untimely.  Union was notified prior to termination meeting and shop steward was present for termination.").)

## II.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict

for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury. *Anderson*, 477 U.S. at 255.

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.    Discussion

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." *Taylor v. Phoenixville Sch. Dist.*, 184

F.3d 296, 305 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(a)).  Here, Campo asserts four claims

under the ADA:  (1) that he was wrongfully terminated because of his disability (diabetes); (2)

that MAP failed to reasonably accommodate his disability; (3) that he was subjected to a hostile

work environment because of his disability; and (4) he was retaliated against because he

requested accommodations for his disability and for complaining about the discriminatory

treatment he received due to his disability.  Campo asserts parallel claims under the Pennsylvania

Human Rights Act ("PHRA").  The same legal standards apply to the ADA and the PHRA, so

the Court considers Campo's ADA and PHRA claims together below.  *See, e.g.*, *Taylor*, 184

F.3d at 306 ("[W]e will only discuss [the plaintiff's] ADA claim because our analysis of an ADA

claim applies equally to a PHRA claim."); *Boice v. Se. Pa. Transp. Auth.*, Civil Action No. 05-

4772, 2007 WL 2916188, at *12 n.20 (E.D. Pa. Oct. 5, 2007).

### A.    *Wrongful Termination*

MAP argues that Campo's wrongful termination claim must be dismissed because (1)

Campo cannot show that he was terminated because of his disability, (2) the company had a

legitimate, nondiscriminatory reason for terminating him, and (3) Campo cannot show that those

reasons were pretextual.  (Doc. No. 21-1 at pp. 12–18, 22– 27.)

To prevail on his wrongful termination claim, Campo "must first make out a prima facie

case of disability discrimination."  *Barclay v. Amtrak*, 435 F. Supp. 2d 438, 443 (E.D. Pa. 2006).

To state a prima facie case of disability discrimination under the ADA, Campo must show that

"(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to

perform the essential functions of the job, with or without reasonable accommodations by the

employer; and (3) he has suffered an otherwise adverse employment decision as a result of

discrimination."  *Taylor*, 184 F.3d at 306 (cleaned up).

The *McDonnell Douglas* burden shifting framework applies where, as here, a plaintiff

does not have direct evidence of discrimination.  Under the *McDonnell Douglas* test, after a plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for terminating the employee.  *See, e.g.*, *Cunningham v. Novo Nordisk,* Civil Action No. 12-6654, 2014 WL 1318390, at *4 (E.D. Pa. Apr. 1, 2014); *Barclay*, 435 F. Supp. 3d at 445.  If the employer succeeds, the burden then shifts back to the employee to show that the stated reasons were false and merely pretextual.  *Cunningham*, 2014 WL 1318390, at *4; *Barclay*, 435 F. Supp. 3d at 445.

        i.     <u>Prima Facie Case</u>

The Court first considers whether Campo has made out a prima facie case of wrongful termination, based on either his September 2019 or December 2019 terminations.  For the purposes of its motion, MAP concedes that Campo suffers from a disability and was qualified to perform the essential functions of his job.  (*See* Doc. No. 21-1 at pp. 13–14.)  Therefore, the sole inquiry is whether Campo was terminated *because of his disability*.

"To meet this standard," Campo must show that his diabetes was a "determinative factor" in MAP's decision to terminate him.  *See Sampson v. Methacton Sch. Dist.*, 88 F. Supp. 3d 422, 439 (E.D. Pa. 2015) (holding that the plaintiff failed to establish a prima facie case of disability discrimination where "[t]he record contained no evidence that [the defendant] imposed adverse employment actions on Plaintiff because she had a torn meniscus, let alone that Plaintiff's injury was the 'determinative factor' in the decisions to impose such employment actions"); *Fiorentini v. William Penn Sch. Dist.*, 665 F. App'x 229, 237 (3d Cir. 2016) (affirming district court's grant of summary judgment on disability discrimination claim where the plaintiff "did not point to any evidence that her disability was connected to, let alone a 'determinative factor' in, the decision to furlough her," and therefore "failed to make out a prima facie case of disability discrimination");

*Moore v. CVS Rx Servs., Inc.*, 142 F. Supp. 3d 321, 346 (M.D. Pa. 2015) ("[T]he Court holds that Plaintiff has failed to adduce sufficient evidence demonstrating that she suffered any adverse action 'as a result of' or 'because of' her disabilities.  ADA plaintiffs must prove that they were treated differently based on . . . their disability.  This requires a showing that the disability played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." (cleaned up)); *Garrow v. Wells Fargo Bank, N.A.*, Civil Action No. 15-1468, 2016 WL 5870858, at *9 (E.D. Pa. Oct. 7, 2016) (granting summary judgment to the employer and holding that the plaintiff failed to state a prima facie case of disability discrimination because she "provided no evidence that her disability was a determining factor in her termination" and "[i]nstead, the record [was] rife with evidence that [the plaintiff] was terminated for reasons that were wholly nondiscriminatory").

Campo cannot recall exactly when he first told anyone at MAP about his disability, but he believes it was shortly after Hinkle took over as his supervisor.  (*See* Campo Dep. at 22:5–23:4 ("I don't remember the date.  But we were in the lounge room and I told [Hinkle]."), 123:18–21 ("I don't remember the date.").)[9]  Yet, Campo admitted in his deposition that no one at MAP ever said anything derogatory about his disability.  (*Id.* at 120:22–24.)  Further, the record does not contain any evidence indicating that Campo's diabetes was a determining factor in MAP's decision to discipline, and ultimately terminate, Campo.

First, although Campo received discipline for taking unauthorized breaks, which he

---

[9] Campo also testified that he informed MAP about his diabetes "[w]hen the new company took over because they were putting so much pressure on me that I wasn't able to take like the breaks I needed to take.  So I had to tell them." (*Id.* at 123:24–124:4.)  In contrast, Jones testified that he did not become aware of Campo's disability until late August at the disciplinary meeting about Campo's final written warning.  (Jones Dep. 82:5–22.)  Taking the facts in the light most favorable to Campo—as we must at this stage—the Court assumes that MAP became aware of Campo's diabetes around January 2019, the timeframe of the acquisition and when Hinkle became Corrugator Superintendent.

asserts is related to his diabetes, Hinkle also filed Disciplinary Action Forms on, and Campo received discipline for, conduct that was entirely unrelated to taking breaks. (*See* Doc. No. 21-5, Ex. P at p. 134 (March 2019 Disciplinary Action Form stating that Campo failed to scan units to a trailer); Doc. No. 21-5, Ex. Q at p. 136 (August 2019 Verbal Warning for wearing jewelry on the production floor); Doc. No. 21-7, Ex. AB at p. 4 (December 2019 Termination Notice, stating that Campo had "failed to unload stock off trailer for the WIP line" and tagged units as "no trailer space available" when there was "plenty of available space"); *id.* (December 2019 Termination Notice, indicating that Campo had "violated [the] Hygiene Requirements by having coffee on the production floor.").)

Second, Campo's own testimony shows that the September 6, 2019 incident—which indisputably caused Campo to be sent home and suspended and which ultimately led to the first termination (*see, e.g.*, Doc. No. 21-6, Exs. V, W, & X)—had nothing to do with his diabetes. Indeed, Campo claimed that he was away from his work station because he was turning the ventilators on—*not* because he was taking a break to eat a snack, take his medicine, or go to the bathroom. (*See* Campo Dep. at 81:23–82:18, 83:13–15; *see also* Doc. No. 21-6, Ex. X ("When asked why you weren't at your position, your response was that you were going around the building to turn on the fans."); Doc. No. 21-6, Ex. W ("We then went on to discuss the incident this morning. Campo gave me the same explanation as above. He was turning the fans on and getting everything ready for the day.").)

Next, two of the three reasons cited in Campo's Notice of Discipline for the second termination were far removed from Campo's diabetes and had nothing to do with taking breaks. (*See* Doc. No. 21-7, Ex. AB at p. 4 (citing Campo's "failure to unload stock off trailer for WIP line" and his violation of the Hygiene Requirements as reasons for his termination).) The Court

24

is also unpersuaded that the third reason was somehow connected to his diabetes.  (*See id.* (On Wednesday 11/27/18 you took a 25-minute break on what was supposed to be a 10-minute break[.]").)  The concern was that Campo had taken a *25*-minute break but, according to Campo's own testimony, he only needed about *five* minutes to eat a snack to maintain his blood sugar levels or take his medicine.  (*See* Campo Dep. at 29:9–22 (testifying that it takes him "three to five minutes" to eat a snack, like a peach); *id.* at 78:12–18 ("[W]henever I need to take my medicine and I know that I have like one or two minutes that I can do it and the supervisor is not around, which he usually is not, then I just real quick go and take my break for two minutes. I never need more than five minutes on the break."); *id.* at 56:3–5 ("[U]sually three minutes. That's the time it takes me just to put something in my mouth before I take my medicine.").) Therefore, none of the reasons given for the second termination were related to Campo's diabetes, let alone a determinative factor in that decision.

Campo argues that MAP treated its employees disparately and that other employees would break the rules and take long and/or unauthorized breaks but would not be disciplined and that therefore he has shown causation.  (Campo Dep. at 86:11–19, 87:19–88:3; *see also id.* at 130:23–131:4 ("These people do all sorts of things they shouldn't do.  They take breaks all the time.  They sleep.  They go to their cars.").)  Even though Campo testified that he would see his coworkers "expressing these behaviors" and did not see anyone reprimand them, he also admitted that he did not have access to his coworkers' disciplinary records.  (*Id.* at 131:9–19.)

Campo has not established that he was treated differently from other similarly situated employees.  *See Sampson*, 88 F. Supp. 3d at 440 (holding that the plaintiff failed to establish that the defendant "treated other similarly situated employees differently" and a prima facie case of disability discrimination because she "acknowledged that she was unaware of how [the

defendant] handled issues with other employees' timeliness" and the principal of the school "specifically recall[ed] speaking to these individuals about their infrequent lateness, the situations being remedied, and being contacted when these individuals were to arrive late").

In sum, the record does not support an inference of causation between Campo's diabetes and his termination.

ii.   Legitimate, Non-Discriminatory Reasons and Pretext

In the alternative, even if Campo could make out a prima facie case of disability discrimination, summary judgment is still appropriate on his wrongful termination claim under the remaining two prongs of the *McDonnell Douglas* test.

First, the record supports MAP's contention that it has articulated legitimate, nondiscriminatory reasons for its decision to terminate Campo—namely, Campo's failure to comply with the company's policies and procedures.  Over the course of 2019, Campo received Notices of Discipline in a progressive manner—verbal warning, written warning, final written warning, suspension, and termination—which tracked the company's progressive disciplinary policy for Union employees and the CBA.  Each time Campo was informed that any further deviation from company policies and procedures would result in further discipline, including termination.  (*See* Doc. No. 21-5, Ex. M at p. 128 (April 3, 2019 Verbal Warning) ("You will receive further disciplinary action if your behavior is not modified or expectations are not met.  The level of future disciplinary action is described above.  For you to remain employed we must see immediate and sustained improvement."); Doc. No. 21-5, Ex. N at p. 130 (June 25, 2019 Written Warning) (same); Doc. No. 21-5, Ex. O at p. 132 (August 21, 2019 Final Written Warning) (same); Doc. No. 21-5, Ex. Q at p. 136 (August 21, 2019 Verbal Warning) (same).) *See Williams v. Pa. Hosp. of Univ. of Pa. Health Sys.*, Civil Action No. 17-2413, 2018 WL

44913337, at *10 (E.D. Pa. Sept. 18, 2018) (concluding that the defendants "successfully articulated legitimate, nondiscriminatory reasons for terminating Plaintiff's employment" because "[o]ver the course of 2015, Plaintiff received disciplinary write-ups in a progressive manner as laid out under the Progressive Steps Policy" and "[e]ach time [she was disciplined] she was informed that any further deviation in care or customer service would lead to her facing further discipline").

Second, Campo has failed to present sufficient evidence to raise a genuine dispute as to whether MAP terminated his employment based on his failure to adhere to company policies or whether that was merely a pretext for discrimination. "To show pretext, a plaintiff must 'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 91 (3d Cir. 2020) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). "To meet that burden, a plaintiff cannot 'simply show that the employer's decision was wrong or mistaken.' The fact that an employer made a poor or unwise decision does not make that decision discriminatory." *Ball v. Einstein Community Health Assocs., Inc.*, 514 F. App'x 196, 199 (3d Cir. 2013) (citations omitted); *see also Wright*, 822 F. App'x at 91; *Curtis v. Tyco Retail Healthcare Grp., Inc.*, Civil Action No. 06-4302, 2008 WL 2967044, at *8 (E.D. Pa. July 31, 2008) ("To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."); *Perry-Hartman v. Prudential Ins. Co. of Am.*, Civil Action No. 17-cv-4732, 2021 WL 3077551, at *7 (E.D. Pa. July

20, 2021) (same).  "Evidence undermining an employer's proffered legitimate reasons therefore must be sufficient to support an inference that the employer did not act for its stated reasons." *Ball*, 514 F. App'x at 199–200 (cleaned up); *Perry-Hartman*, 2021 WL 3077551, at *7 ("Thus, a plaintiff survives summary judgment by proffering admissible evidence that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." (cleaned up)).  A non-moving party can satisfy that burden by "demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Ball*, 514 F. App'x at 199–200 (cleaned up); *Wright*, 822 F. App'x 91.

Campo argues that he has satisfied his burden of showing pretext, pointing to his testimony that other similarly situated employees were treated more favorably than him; his allegations that Hinkle harassed him and overall exhibited a pattern of antagonism against him; MAP's allegedly contradictory reasons for terminating him; and the totality of the circumstances. (*See* Doc. No. 22 at pp. 20–29.)  We disagree.

For the reasons discussed above in our analysis on whether Campo's termination was "a result of" or "because of" his diabetes, this Court is unpersuaded by Campo's scant evidence that other similarly situated employees were treated more favorably than him.  All that Campo has set forth in terms of comparator evidence is his own testimony that others took breaks or slept at work.  (Campo Dep. at 86:11–19, 87:19–88:3; *id.* at 130:23–131:4 ("These people do all sorts of things they shouldn't do.  They take breaks all the time.  They sleep.  They go to their cars."); *see also* Doc. No. 22-3, Ex. G, Pl.'s Resp. to Interrog. #13 ("Plaintiff recalls the following coworkers regularly taking 30-plus minute breaks:  Ramon, John, Guillermo, Troy, Jack, Pablo and Eric.").)

Campo does not set forth *any* evidence showing that those coworkers were similarly situated to him in all respects, or, for that matter, even address the issue.[10]  *See Francis v. Lehigh Univ.*, Civil Action No. 10-CV-4300, 2013 WL 787089, at *7 (E.D. Pa. Mar. 1, 2013) ("Certainly, disparate treatment of a plaintiff's comparators is evidence of pretext and can give rise to an inference of discrimination.  But the comparator evidence presented by Plaintiff is unconvincing. Plaintiff fails to demonstrate that 'the similarity between the compared employees . . . exist in all relevant aspects of their respective employment circumstances.'" (citation omitted)); *see also id.* (explaining that Dr. B was not a proper comparator to the plaintiff because Dr. B "testified truthfully and voluntarily proposed and carried out remedial actions for his behavior" and "was disciplined for an isolated incident of sexual harassment involving one student," whereas the plaintiff had "lied to Faculty Investigators . . . about his sexual relationships with University students" and was "disciplined for repeatedly violating the University's Policy by having an on-going relationship with two students"); *cf. Abdul-Latif v. County of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014) (denying summary judgment where the employer claimed that the other employees who violated the company's email policy were not "similarly situated" to the

---

[10] For example, it is unclear from the record whether Ramon, John, Guillermo, Troy, Jack, Pablo, or Eric worked on the wet end of the corrugator or on the dry end of the corrugator, like Campo did.  To that end, Hinkle testified that the employees who worked on the wet end of the corrugator did not need to notify him each and every time they left their post because they were right by the bathroom.  (*See* Hinkle Dep. at 89:22–90:17 ("Q: Does every single employee have to tell you when they take a bathroom break?  A: Every single employee does not.  So on the wet end of the corrugator, there's three guys there.  So one of them will always fill in for each other.  The bathroom is literally five feet from where they are.  So if they run in the bathroom to go to the bathroom, no, they don't tell me, they don't need to tell me.  Now, if one guy is on break and another guy has to go, yeah, then they do tell me . . . On the dry end . . . they tell me and they go to the bathroom and I fill in their spot for them.").)

Further, Campo does not address the quantity or the frequency with which those individuals took breaks—other than his testimony that they did so "regularly" or "all the time"—or engaged in other misconduct.  (*See, e.g.*, Hinkle Dep. 100:6–14 ("[W]hen I got here, I wrote another guy up for wearing jewelry, and after I wrote him one time, he never wore the jewelry again.  I wrote other people up for multiple other things; the only difference was when I wrote them people up, they got onboard with the policy and realized there was a change.  Campo fought it every single bit of the way until he was fired.").)

plaintiff, reasoning that "the material facts are in dispute and even if they were not in dispute, I could not find as a matter of law that plaintiff's violations were more serious than her co-workers"). In addition, MAP provided evidence indicating that at least one of those non-disabled coworkers received discipline for taking an excessive and unauthorized break. (*See* Doc. No. 23-1 at p. 15, Ex. AK.)

Ultimately, the Court finds that, based on the sparse comparator evidence before it, no reasonable juror would find that Campo was treated less favorably than similarly situated coworkers. *Accord Hatch v. Franklin County*, 755 F. App'x 194, 199 (3d Cir. 2018) ("But Hatch's only proof . . . is her own affidavits and deposition testimony. Although a plaintiff's sworn statements by themselves may be sufficient to create a genuine dispute of material fact, we do not consider Hatch's statements in this case to create a genuine fact issue. Considering the record of Hatch's disciplinary violations, and even when viewed in a light most favorable to Hatch, her own testimony is not sufficient, standing alone, to allow a factfinder to disbelieve [the defendant's] non-discriminatory reason for firing her or to determine that discrimination was 'more likely than not a motivating or determinative cause' of her determination.").

Next, Campo contends that MAP's reasons for terminating him are inconsistent and contradictory. (*See* Doc. No. 22 at p. 27 ("Defendant argues *ad nauseam* that Hinkle was moved into his supervisor role because he 'earned a reputation as a firm disciplinarian' and had some 'mission to improve the corrugator's operation and . . . compliance with . . . policies and safety standards.' While such a premise sounds nice, it is not true." (citation omitted)); *see also id.* at pp. 27–28 (arguing there is pretext because "Defendant tries to paint the picture that the new owner Royal Group/Schwarz Partners focused on safety and policy, in reality, all that means . . . was to become food safety compliant" and because Hinkle was "allowed to run free with

discipline" despite "being coached in our expectations in leadership as far as maintaining, you know, the proper channels for discipline and maintaining the proper allowances for the employee" (cleaned up)).).  In so arguing, Campo misconstrues the standard.  To show pretext, a non-moving party can point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions *in the employer's proffered legitimate reasons for its action*."  *Ball*, 514 F. App'x at 200 (cleaned up) (emphasis added).

MAP has never wavered in its legitimate, non-discriminatory reasons for firing Campo: all along, MAP has maintained that it disciplined and ultimately terminated Campo for his failure to comply with the company's policies and procedures and for insubordination.  (*See, e.g.*, Doc. No. 21-5, Ex. M (Verbal Warning) ("This incident is in clear violation of the Plant Rules and Regulations . . . Disciplinary Offense 7. Unauthorized absence from regular work station or department."); Doc. No. 21-5, Ex. N (Written Warning) ("This incident is similar to your actions on 4/3/19 that you received a Verbal Warning for, and another clear violation of the Plant Rules and Regulations . . .  Disciplinary Offense 7. Unauthorized absence from regular work station or department."); Doc. No. 21-5, Ex. O (Final Written Warning) ("This incident is similar to your actions on 4/3/19 and 6/6/19 that you received a Verbal Warning and Written Warning for respectively.  This is another clear violation of the Plant Rules and Regulations . . .  Disciplinary Offense 7. Unauthorized absence from regular work station or department."); Doc. No. 21-5, Ex. Q (Verbal Warning) ("[Y]ou were observed wearing jewelry in the Manufacturing & Warehouse area . . . This incident is a clear violation of the Hygiene & PPE Requirements."); Doc. No. 21-6, Ex. X (First Termination); Doc. No. 21-7, Ex. AB at p. 4 (Second Termination) ("Your behavior described above, is considered an intentional and willful disregard of company policies and procedures."); *see also* Hodges Dep. at 84:17–85:6 ("Q: What's your understanding as to why

Mr. Campo was fired?  A: My understanding, we had repeated violations of plant policy, plant rules, hygiene policy, hygiene rules.  In addition to that, I'm certain there was verbiage around breaks, excessive breaks, all of this witnessed, reported back to that employee with the very simple expectation that the behavior would change, and for whatever reason, he really chose in my opinion to fight us on what I considered very simple rules that all of the other 110 employees were expected to abide by as well."); Jones Dep. at 66:8–17 (Q: What's your understanding as to why Mr. Campo was fired?  A: Failure to abide by multiple company rules and policies . . . [P]art of it was not notifying his supervisor of where he was going and when.").)  Campo has failed to rebut this stream of evidence.  *See Curtis*, 2008 WL 2967044, at *8 (concluding that the plaintiff had failed to meet his burden of showing pretext:  "Defendant has provided evidence which Plaintiff has failed to rebut, mainly in the form of deposition testimony from various members of its staff . . . which clearly establishes it terminated Plaintiff because of his insubordinate behavior and because he entered the Tyco facility under false pretenses.").

Campo attempts to manufacture a dispute of fact by highlighting that Hinkle was placed into the role of Corrugator Superintendent to make space for another worker to be the Display Superintendent (not because of his prowess for disciplining employees) and that there were no sweeping changes in MAP's safety policy.  But these are *not* genuine disputes of material fact—they are irrelevant to our analysis here, which is focused on whether MAP had inconsistent reasons for terminating Campo.  It did not.

Campo also claims that he never engaged in the conduct that he was accused of—i.e., that all of the incidents he was written up for were "lies" that Hinkle had contrived.  However, that is of no moment, as it simply amounts to Campo saying that MAP is "wrong or mistaken," which is not enough for him to overcome his burden at the summary judgment stage.  *See Murrell v. Penn*

*Presbyterian Med. Ctr.*, Civil Action No. 18-1202, 2019 WL 2177911, at *6 (E.D. Pa. May 17, 2019) ("Plaintiff has stated that she was not disruptive when she was in the patient's room, that she did not access the patient's expanded file, and that she was not the author of the threatening text message to the patient.  However, Plaintiff cannot simply show that the employer's decision was wrong or mistaken.  Plaintiff must instead present evidence to support an inference that the employer did not act for its stated reasons.  Plaintiff has presented no evidence to show that Defendant did not act for the three stated reasons . . . Therefore, this claim must be dismissed." (cleaned up)); *see also Ball*, 514 F. App'x at 201–02 ("Even if a factfinder credited all of Ball's innocent explanations for that seemingly-incriminating data, those explanations would, at best, suggest that the employer's decision was wrong or mistaken, not that ECHA fabricated the concern . . . Accordingly, Ball has failed to produce evidence that casts sufficient doubt upon Appellees' proffered reason to establish that it was pretextual."); *Arana v. Temple Univ. Health Sys.*, 776 F. App'x 66, 70 (3d Cir. 2019) ("At her deposition, [the plaintiff] said that she was not sleeping and had not exceeded her break.  But an employer may act on a legitimate, nondiscriminatory reason even if it is wrong or mistaken.  We focus not on what actually happened, but on what the employer honestly believed."); *Mercer v. Se. Pa. Trans. Auth.*, 26 F. Supp. 3d 432, 446 (E.D. Pa. 2014) ("[A]lthough he disagrees with SEPTA's characterization of his actions and disputes the bases for several of his VMIS violations, at best those contentions suggest that SEPTA's decisions were 'wrong or mistaken,' not that they were actually the product of discriminatory animus."); *Francis*, 2013 WL 787089, at *9 ("Plaintiff's attempt to satisfy his pretext burden by simply arguing that he did not violate Lehigh's Harassment Policy . . . is also unavailing.  The Third Circuit has made clear that 'it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken . . .'  Plaintiff's belief that Lehigh

made a wrong decision is of no consequence in a pretext inquiry, as it is only Lehigh's belief relative to its proffered reason that is relevant." (citation omitted)).

For those reasons, we grant summary judgment in favor of MAP on Campo's claim for wrongful termination.

### B.    *Failure to Reasonably Accommodate*

Next, MAP argues that Campo's failure to accommodate claim should be dismissed because MAP reasonably accommodated Campo's diabetes by allowing him to take breaks as needed to have snacks, as long as he notified someone.  (Doc. No. 21-1 at pp. 27–29.)

Under the ADA, unlawful discrimination includes failing to make reasonable accommodations for a plaintiff's disabilities.  *See* 42 U.S.C. § 12112(b)(5)(A); *see also Taylor*, 184 F.3d at 306 ("Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."); *Mercer*, 26 F. Supp. at 440  ("[T]he ADA defines discrimination to include not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." (cleaned up)); *Pallatto v. Westmorland Cnty. Children's Bureau*, No. 2:11cv1206, 2014 WL 836123, at *5 (W.D. Pa. Mar. 4, 2014) ("Under the ADA, adverse employment decisions 'include refusing to make reasonable accommodations for a plaintiff's disabilities.'" (citation omitted)).

Because "[f]ailure to accommodate an employee's disability is itself evidence of discrimination under the ADA," "[t]here is no need in such a case for indirect proof of discrimination."  *Boice*, 2007 WL 2916188, at *12.  Thus, the *McDonnell Douglas* burden shifting framework does not apply.  *Id.*; *see also Ferreri v. Mac Motors, Inc.*, 138 F. Supp. 2d

645, 650 n.1 (E.D. Pa. 2011) ("In a failure to accommodate claim . . . the *McDonnell Douglas* test does not apply.  Once a plaintiff alleges facts that, if proven, would show that an employer should have reasonably accommodated an employee's disability and failed to, the employer has discriminated against the employee.").

To establish a *prima facie* case for failure to accommodate, Campo must show that "(1) he had a disability; (2) [MAP] had notice of this disability; (3) he can perform the essential functions of his position with reasonable accommodation; and (4) [MAP] failed to provide an accommodation." *Boice*, 2007 WL 2916188, at *12 (citation omitted).  "With respect to the last element, to demonstrate that an employer did not provide a reasonable accommodation, Campo must prove that "(1) [MAP] knew about the employee's disability; (2) [he] asked for an accommodation or assistance; (3) [MAP] did not make a good-faith effort to accommodate the employee; and (4) [he] could have been accommodated." *Arana*, 776 F. App'x at 71 (citing *Taylor*, 184 F.3d at 319–20).)

As a threshold matter, we must first determine whether Campo initially notified MAP of his need for an accommodation.  *Boice*, 2007 WL 2916188, at *13 ("Under the ADA, an employee must make an initial request for an accommodation in order to trigger an employer's obligation to participate in the interactive process of designing a reasonable accommodation for the employee's disability.").  "[W]hile the notice does not have to be in writing . . . or formally invoke the magic words 'reasonable accommodation,' the notice nonetheless must make clear that the employee wants assistance for his or her disability.  In other words, the employer must know of both the disability and the employee's desire for accommodations for that disability." *Taylor*, 184 F.3d at 313; *see also id.* ("What matters under the ADA are not formalisms about the manner of the request, but whether the employee . . . provides the employer with enough

information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.").

Here, viewing the facts in the light most favorable to Campo, a reasonable juror could find that Campo notified MAP that he needed an accommodation for his diabetes.  Campo testified that when his supervisor changed from Peace to Hinkle, he was forced to inform MAP of his disability since he no longer had the flexibility he had had under the previous leadership to take the breaks he needed to accommodate his diabetes.  (*See* Campo Dep. at 122:17–22, 123:24–124:4 ("When the new company took over I had to tell them because they were putting so much pressure on me that I wasn't able to take like the breaks I needed to take.  So I had to tell them.").)  Moreover, Campo has provided medical documentation indicating that he needed breaks to maintain his blood sugar levels (Doc. No. 22-3, Ex. J at p. 99; Doc. No. 21-6, Ex. S at p. 4) and testified that he provided the May 2019 note to MAP (Campo Dep. at 71:22–72:8).  Although MAP maintains that it has no record of the May 2019 doctor's note and asserts that it did not know about Campo's diabetes until late August 2019, when it received the second doctor's note, Campo has raised a genuine dispute of material fact as to when MAP had notice.

"Once the employer knows of the disability and the employee's desire for accommodations," the burden shifts to the employer to engage in the accommodation process.  *Taylor*, 184 F.3d at 315; *Boice*, 2007 WL 2916188, at *13; *see also* 29 C.F.R. § 1630.2(o)(3); *Taylor*, 184 F.3d at 311 (Under the ADA regulations, "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation.  This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.").  An employer fails to engage in the interactive process when it

knows of the employee's disability and desire for accommodations but nonetheless "offer[s] no accommodations or assistance in finding them" and "simply [sits] back and continue[s] to document [the employee's] failures." *Taylor*, 184 F.3d at 315 ("Notwithstanding Taylor's previous twenty years of strong performance and the school district's clear notice of Taylor's disability and desire for accommodations, the school district offered no accommodations or assistance in finding them, made Taylor's job more difficult, and simply sat back and continued to document her failures.  A reasonable jury could conclude that the school district did not engage in an interactive process of seeking accommodations and is responsible for the breakdown in the process.").  At bottom, "[t]he interactive process, as its name implies, requires the employer to take some initiative." *Id.* at 315.

That said, "[t]he interactive process does not dictate that any particular concession must be made by the employer." *Id.* at 317.  "All the interactive process requires is that employers make a good-faith effort to seek accommodations." *Id.*  "Employers can show their good faith in a number of ways, such as taking steps like the following:  meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered the employee's request, and offer and discuss available alternatives when the request is too burdensome." *Id.*  Ultimately, the employer is not required to offer the "best" accommodation or the employee's "preferred" accommodation; the accommodation need only be reasonable.  *See Yovtcheva v. City of Phila. Water Dep't*, 518 F. App'x 116, 121–22 (3d Cir. 2013) (granting summary judgment to employer on failure to accommodate claim because it was clear that "a partial-face respirator could have alleviated [the plaintiff's] claustrophobia problems while protecting her from the effects of exposure to organic solvents," even though the employee

refused that accommodation, and noting that "an employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation" (cleaned up)); *see also Schulman v. Wynn Las Vegas, LLC*, 2:12-cv-01494-RCJ-GWF, 2016 WL 199416, at *5 (D. Nev. Jan. 15, 2016) ("Permitting Plaintiff to manage his blood sugar with food, insulin, and testing supplies cannot be said not to have been a reasonable accommodation, which need not be the employee's preferred accommodation."); *accord Perry-Hartman*, 2021 WL 3077551, at *15 ("No reasonable jury could find that Defendant was required to grant Plaintiff's requests for a support person at all meetings between Smyth and her or for Smyth to provide Plaintiff with primarily written feedback . . . Plaintiff's insistence on a single accommodation was unreasonable as a matter of law." (cleaned up)).

Here, Campo testified that MAP prohibited him "from eating snacks and from going to the bathroom." (Campo Dep. at 33:8–33:23; *accord id.* at 23:1–4 ("I told him that because of my blood sugar problems, I had to drink something. And he said, well, you're not supposed to be here. I'm going to have to write you up.").)[11] Therefore, Campo has raised a genuine dispute of material fact as to whether MAP reasonably accommodated his disability, since his medical notes indicated that he needed breaks to maintain his blood sugar levels. *See Bellofatto v. Red Robin Int'l, Inc.*, Civil Action No. 7:14CV00167, 2014 WL 7365788, at *11–12 (W.D. Va. Dec. 24, 2014) (denying the employer's motion for summary judgment where the plaintiff "presented sworn testimony and medical documentation demonstrating that her diabetes does not prevent her from working as long as it is properly treated, and that the only accommodation she requires

---

[11] There may certainly be credibility issues with Campo's own self-serving testimony—particularly given the fact that much of Campo's deposition testimony suggests that he took regular breaks, including his testimony that he did not believe there was a need to notify Hinkle that he was taking a break, seeing it as a "waste of time"—but the Court is not permitted to resolve such credibility issues at this time. *Anderson*, 477 U.S. at 255.

is the opportunity to take a short break to eat or drink something to regulate her blood sugar levels.  [The plaintiff] has also presented sworn deposition testimony indicating that she was repeatedly denied the opportunity to take breaks, even though she was told during her interview that the need for breaks would not be a problem"); *see also Boice*, 2007 WL 2916188, at *14–15 (finding a genuine issue of material fact as to whether the employer failed to accommodate the plaintiff's disability and holding that the supervisor's alleged response to the plaintiff's requests for accommodations "would fall far short of the interactive process specified in *Taylor*," where the plaintiff testified that he told his supervisor he wanted to be on a steady shift because of his diabetes and "[the supervisor] said, you know, he didn't care about that").

Campo has raised a genuine dispute of material fact as to whether MAP engaged in the interactive process.  Jones admits that no alternative accommodations were presented to Campo, and Jones and Hinkle never discussed alternative accommodations.  And it does not appear that Jones directly asked Campo what accommodation he wanted.  (*See* Jones Dep. 115:1–116:16; *see also id.* at 115:19–23 ("Q: Were there any other alternatives presented to Mr. Campo after you found out about his medical accommodation needs?  A: No, he never said as many breaks as possible wasn't good enough."); *id.* at 116:8–16 ("Q: Was there ever any conversations, following Mr. Campo's not advising Marvin Hinkle when he was going to take a break, any other conversations after that where you and Marvin discussed any other alternatives for what Mr. Campo should be able to do to accommodate his medical needs?  A: No, we thought we were accommodating just fine.").)  *See Taylor*, 184 F.3d at 315 (explaining that signs of engaging in the interactive process in good faith include, among others, asking the employee what he specifically wants and offering and discussing available alternatives); *cf. Perry-Hartman*, 2021 WL 3077551, at *15 ("not[ing] that Defendant provided alternative

accommodations or provided the requested accommodations in part" and finding that the defendant engaged in the interactive process in good faith).  There is also no indication that management discussed with Campo the possibility of moving him to the wet end of the corrugator, so that he was near a bathroom and could easily run to the restroom and have other employees cover for him if he needed to take a quick break.[12]

MAP's insistence that no one knew about Campo's disability until August 2019 also belies their contention that they reasonably accommodated Campo's claim.  As discussed above, we must accept, for the purposes of this motion, that Campo notified MAP of his disability in January 2019—by arguing otherwise, MAP essentially admits that it did nothing to accommodate Campo's disability for months (i.e., until shortly before Campo's termination).  *Cf. Keyhani v. Trs. of Univ. of Pa.*, Civil Action No. 17-3092, 2019 WL 2568279, at *5 (E.D. Pa. June 21, 2019) ("The evidence . . . shows that Plaintiff started working from home directly after providing Defendant with the note from Dr. Allen and then transitioned into working a three-day week.  The facts, viewed in Plaintiff's favor, show no unreasonable delay in Defendant's engagement in the interactive process or discussion of accommodations with Plaintiff.").

And Hinkle's testimony indicates that he actually made Campo's job harder as time went on by ratcheting up the notification requirement—specifically, moving from allowing Campo to notify anyone when he left the corrugator to take breaks to requiring that Campo tell only him. (Hinkle Dep. at 216:3–217:5 ("Q: So I just want to clarify.  No more breaks without telling supervision, did that mean you or another supervisor, or could [he] have told the other corrugator people as well?  A: Well, by this time, he probably would have been to [sic] just telling me.  So

---

[12] Hinkle testified that the employees who worked at the "wet end" of the corrugator did not have to tell him when they took a break because they were right next to one of the bathrooms. (Hinkle Dep. at 249:10–250:3). In contrast, Campo was located on the other end of the corrugator—the "dry end."

after multiple, multiple steps and giving him leniency, it would have been, you know what, now you have to tell me; make sure I know where you go, yes, probably."), 217:6–218:2, 218:3–17 ("Q: I know your testimony before was that supervisor could have meant anybody in the corrugator department and also . . . Or Curtis Peace or somebody else, and then it did change to he can only tell you, meaning you were the supervisor at that point?  A: [Y]eah, that's basically the way it went.  After numerous, numerous warnings and giving the option to tell other people and do it the right way, and he didn't, then it . . . because yes, you must tell me, I need to know where you're going when you leave the forklift area.").)  Overall, viewing Hinkle's deposition testimony in the light most favorable to Campo, a reasonable juror could conclude that Hinkle did not take seriously the need to accommodate Campo's disability.  (*See id.* at 184:20–23 ("So he could have just wrote that on there.  It doesn't mean he actually had diabetes.  I mean, he made up a complete letter about me that was . . . filled with lies, so I have no idea."), 184:24– 185:7 ("Q: You think he could have made up having diabetes?  A: I mean, I know for a fact that letter he wrote [the grievance] is 100 percent false, so I don't know.").)

Furthermore, MAP's reliance on *Yovtcheva v. City of Philadelphia Water Department* is misplaced.  (*See* Rough Drft. Hr'g Tr. 8:8–9:11.)  In *Yovtcheva*, the plaintiff worked as a chemist in a laboratory and her asthma flared up when she worked with certain solvents.  518 F. App'x at 117–18, 120–21.  Her employer, the Water Department, offered her the option of wearing a full-face respirator for protection, but she only wore it a few times because it made her feel claustrophobic and resulted in her experiencing a panic attack.  *Id.* at 118.  Afterwards, the Water Department offered the plaintiff a partial-face respirator, which she refused to try.  *Id.*  The Third Circuit held that the "uncontroverted record reveals that the Water Department offered her a reasonable accommodation by use of a partial-face respirator but that she refused to attempt to

use such a respirator," and affirmed dismissal of the plaintiff's failure to accommodate claim.  *Id.* at 120–21.  But that case is starkly different than the facts before us.  There, the employer clearly engaged in the interactive process by working with the plaintiff and offering two different accommodations—the full-face respirator first and then an alternative (the partial-face respirator) when the first accommodation did not work out.  Here, it is unclear that MAP ever discussed the sufficiency of the accommodation with Campo, let alone engaged in any discussion about possible alternatives or whether the accommodation was working for him.  (*See* Jones Dep. at 115:7– 23 ("Q: Did you ever check with him whether that was a sufficient accommodation?  A: I asked him if he understood in the meeting, and he said yeah . . . Q: But did he ever affirmatively say yes, this is an okay accommodation pursuant to my medical needs?  A: He never used those specific words.  Q: Anything like that?  A: I asked him if he understood, he said yes.  Q: Were there any other alternatives presented to Mr. Campo after you found out about his medical accommodation needs?  A: No, he never said as many breaks as possible wasn't good enough.").)

Viewing the facts in the light most favorable to Campo, a reasonable juror could find that MAP failed to reasonably accommodate Campo.  Accordingly, the Court denies MAP's motion for summary judgment as to this claim.

## C.    *Retaliation*

Next, Campo claims that he was retaliated against for requesting accommodations and for complaining about Hinkle's treatment of him.  MAP contends that Campo's retaliation claim must be dismissed because (1) Campo has not shown any causal connection between his protected activities and his terminations, (2) the company had non-retaliatory reasons for firing him, and (3) Campo cannot show that those reasons were pretextual.  (Doc. No. 21-1 at pp. 18– 27.)

The *McDonnell Douglas* burden shifting framework discussed above applies to Campo's retaliation claim.

  i. <u>Prima Facie Case</u>

To make out a prima facie case of retaliation, Campo must show that (1) he engaged in a protected activity; (2) he "was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity"; and (3) "there is a causal connection between the protected activity and the adverse action." *Mercer*, 26 F. Supp. 3d at 446–47 (cleaned up); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). For the purposes of this motion, MAP concedes that (1) Campo engaged in protected activity when he requested accommodations for his disability, when he filed a harassment grievance against Hinkle, and when he filed an EEOC charge; and (2) that he suffered an adverse employment action when he was terminated, first in September 2019 and then again in December. (Doc. No. 21-1 at pp. 18–19.) However, MAP argues that Campo's case fails at the third prong because he has not provided any record evidence demonstrating a causal link between the protected activities and his terminations. (*Id.* at p. 19.)

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Oden v. SEPTA*, 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015) (citation omitted). Other evidence may also support a causal link. *See Farrell*, 206 F.3d at 280–81 ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference. For example, a plaintiff may

establish the connection by showing that the employer gave inconsistent reasons for terminating the employee . . . Moreover, we have been willing to explore the record in search of evidence, and our caselaw has set forth no limits on what we have been willing to consider.").

Campo argues that temporal proximity establishes a causal link in this case.  (*See* Doc. No. 22 at pp. 21–22.)  We agree.

First, Campo testified that he gave MAP his May 30, 2019 doctor's note—and therefore, requested an accommodation around that time.  (Campo Dep. at 71:22–72:8.)  And Campo was written up for conduct that occurred on June 6, 2019—one week later.[13]  (Doc. No. 21-5, Ex. N at p. 130.)  The Court finds this timing to be unduly suggestive.  *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (holding that the temporal proximity was unduly suggestive where the plaintiff was terminated seven days after she engaged in protected activity); *Stocker v. Green, Tweed & Co., Inc.*, Civil Action No. 18-4503, 2020 WL 4437113, at *16 (E.D. Pa. Aug. 3, 2020) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, the temporal proximity in this case [one week] is in the realm of what this Court and others have found sufficient at the prima facie stage." (cleaned up)); *see also Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188–89 (3d Cir. 2003) (holding that ten days was sufficient to establish a causal link).

Second, Campo's next doctor's note is dated August 15, 2019 (*see* Doc. No. 21-6, Ex. S

---

[13] Although the parties do not address it in their briefs, written warnings can constitute adverse employment actions where, as here, a progressive discipline policy is in place.  *See Allen v. Nutrisys., Inc.*, Civil Action No. 11-4107, 2013 WL 1776440, at *6 n.6 (E.D. Pa. Apr. 25, 2013) ("Written warnings can constitute adverse employment actions for the purpose of establishing the second prong of a prima facie retaliation claim.  When a warning is part of a progressive disciplinary policy such that each previous infraction raises the penalty for a subsequent infraction, courts in the Third Circuit have classified it as an adverse employment action." (citations omitted)); *see also Dominici v. Reading Hosp./Tower Health*, Nol. 5:18-cv-04181, 2020 WL 2898658, at *16 (E.D. Pa. June 3, 2020) ("Although written warnings, in general, are not necessarily adverse actions . . . the written warnings here are sufficiently adverse").

at p. 4) and Campo received his final written warning on August 21 for conduct that occurred on August 15 (*see* Doc. No. 21-5, Ex. O at p. 132 (August 21, 2019 Final Written Warning that Campo received for taking an unauthorized break on August 15.  It is unclear from the record before us the exact date MAP received the doctor's note (*see, e.g.*, Hinkle Dep. at 159:1–24; Hodges Dep. 117:1–15; Jones Dep. 113:1–7), but viewing the facts in the light most favorable to Campo, a reasonable juror could find that MAP had the doctor's note prior to Campo receiving the final written warning on August 21.  Undoubtedly, this is unduly suggestive timing.  *See, e.g.*, *Dean v. Phila. Gas Works*, Civil Action No. 19-4266, 2021 WL 2661485, at *11 (E.D. Pa. June 28, 2021) ("[A] reasonable factfinder may be able to infer a causal connection between the complaint and his termination.  The passage of mere hours between an employee's engagement in a protected activity and an adverse employment action can undoubtedly be unduly suggestive of a causal connection between both events."); *Ballard v. Mercy Catholic Med. Ctr. of Se. Pa.*, Civil Action No. 12-0779, 2013 WL 3305235, at *9 (E.D. Pa. June 28, 2013) ("Plaintiff was suspended on the same day she submitted her complaints, and was permanently fired two days later.  In the Third Circuit, this sort of close temporal connection, between a plaintiff's protected activity and the adverse action against her, suffices to show causation at the prima facie stage.").

Next, Campo filed a grievance on August 29 and 30, 2019 (*see* Doc. No. 21-6, Ex. T at pp. 6–8) and then was suspended on September 6, 2019—one week later.  MAP does not dispute that the suspension was an adverse employment action.  (Rough Drft. Hr'g Tr. 22:22–25.)  For the reasons discussed above, this timing is unduly suggestive.

Accordingly, the Court finds that Campo has met his burden of showing a causal link between at least some of his protected activities and adverse employment actions and therefore has established a prima facie case of retaliation.

ii.     <u>Legitimate, Nonretaliatory Reasons and Pretext</u>

For the reasons discussed *supra* with respect to the wrongful termination claim, the Court concludes that MAP has met its burden of articulating a legitimate, nonretaliatory reason for terminating Campo—his failure to adhere to company policies.

Now, the burden shifts to Campo to show that that explanation was nothing more than a pretext for MAP's retaliatory reasons. Campo argues that he experienced a pattern of antagonism and that MAP's reasons for terminating him are inconsistent and contradictory, both of which support a finding of pretext. We disagree.

Upon a close review of the record, and the evidence Campo cites in support of his argument that Hinkle was hostile to him (*see* Doc. No. 22 at pp. 23–25), the Court finds that Campo's complaints are, in essence, claims that Hinkle closely monitored or scrutinized his work. (*See* Campo Dep. at 44:15–25 (testifying that Hinkle "would be like checking off, like checking my work. He would be like harassing me, like stalking me. Like he would be behind me while I was working. Like with this demeanor of like I'm not doing what I have to do or right. I would go on my breaks and he would follow me throughout the entire place."); *id.* at 30:15–23 ("He would be spying on me. Like he would hide. He would see what I'm doing."); *id.* at 45:4–10 ("Q: [S]o that's what you're claiming was scrutiny of your work, as I understand it? A: Yeah. Like he was always trying to see what he could write me up on, like to see if he could catch me doing something wrong so he could write me up on it.").) Given the safety concerns at play when working the corrugator, we do not consider Hinkle's scrutiny of Campo's work in this case to establish a pattern of antagonism. *See Oden*, 137 F. Supp. 3d at 792 ("[W]e do not find the 'excessive monitoring' claim to evidence of [sic] a pattern of antagonism."). Nor is this Court persuaded that non-disabled employees were treated more favorably than Campo.

46

Likewise, for the reasons discussed *supra* with respect to Campo's wrongful termination claim, the Court cannot conclude that MAP's reasons for terminating Campo were inconsistent or implausible.  Again, MAP repeatedly stated that it terminated Campo for his failure to comply with company policies, and the documents and deposition testimonies before us fail to contradict that statement.

However, Campo also argues that the temporal proximity between his protected activities and various adverse employment actions show that MAP's stated reason for terminating him was pretextual.  (Doc. No. 22 at pp. 20–23.)  As the Third Circuit has recognized, "evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Farrell*, 206 F.3d at 286 ("We recognize that by acknowledging that evidence in the causal chain can include more than demonstrative acts of antagonism or acts actually reflecting animus, we may possibly conflate the test for causation under the prima facie case with that for pretext.  But perhaps that is inherent in the nature of the two questions being asked—which are quite similar.").  In addition, courts in this Circuit have explained that temporal proximity alone is sufficient to establish pretext.  *See Isley v. Aker Phila. Shipyard, Inc.*, 275 F. Supp. 3d 620, 632 n.12 (E.D. Pa. 2017) ("The Shipyard's argument that Isley's retaliation claim fails because 'mere temporal proximity . . . is wholly insufficient to establish pretext,' misstates the law.  To the contrary, the Third Circuit has held that 'when temporal proximity . . . is unduly suggestive, this is sufficient standing alone to . . . defeat summary judgment." (citations omitted)); *Proudfoot v. Arnold Logistics, LLC*, 629 F. App'x 303, 308 (3d Cir. 2015) ("Temporal proximity is a factor that can be used to establish the third element of a prima facie case of retaliation as well as to discredit an employer's justification at the third step of the *McDonnell Douglas* analysis . . .

Thus, temporal proximity may be sufficient to show pretext in certain narrow circumstances based on the particular facts and stage of a case." (cleaned up)); *Laborde v. Casino*, 3:16-CV-769, 2018 WL 3824368, at *3 (M.D. Pa. Aug. 10, 2018) (rejecting the defendant's argument that temporal proximity "is insufficient alone to demonstrate pretext"). We find that such circumstances exist here, too, and therefore deny MAP's summary judgment motion as to the retaliation claim.

### D. *Hostile Work Environment*

Last, MAP argues that Campo's hostile work environment claim is subject to dismissal. (Doc. No. 21-1 at pp. 29–34.) To state a hostile work environment claim under the ADA, a plaintiff must prove that: (1) he "is a qualified individual with a disability under the ADA"; (2) he "was subject to unwelcome harassment"; (3) "the harassment was based on [his] disability or a request for an accommodation"; (4) "the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment"; and (5) the defendant "knew or should have known of the harassment and failed to take prompt effective remedial action." *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999); *Barclay*, 435 F. Supp. 2d at 448. In this case, MAP challenges the third and fourth elements—that Campo was harassed because of his diabetes or because he requested an accommodation and that the harassment was sufficiently severe or pervasive. (Doc. No. 21-1 at pp. 29–34.) In determining whether a work environment is hostile, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Walton*, 168 F.3d at 667.

#### i.   The conduct was not based on Campo's disability

The ADA "does not make all harassment, or every unpleasant working environment,

actionable under the law." *Barclay*, 435 F. Supp. 2d at 448–49.  A supervisor's behavior toward a plaintiff may be offensive without being *based on* or *because of* that employee's disability. *Walton*, 168 F.3d at 667; *see also Mercer*, 26 F. Supp. 3d at 444 ("Standing alone, the fact that Berry's behavior toward Mercer may have been offensive does not indicate that it was based on Mercer's disability, as is required for liability under the ADA." (cleaned up)).  In other words, "evidence demonstrating a poor relationship between an employer and an employee is not, by itself, sufficient to sustain a hostile work environment claim." *Buffa v. N.J. State Dep't of Judiciary*, 56 F. App'x 571, 575 (3d Cir. 2003) (citation omitted); *see also Brown v. Vanguard Grp.*, Civil Action No. 16-946, 2017 WL 412802, at *20 (E.D. Pa. Jan. 30, 2017) ("[Plaintiff] alleges that [her supervisor] frequently walked by her desk to see if she was there, made false accusations about her performance in her reviews, . . . removed her work-from-home privileges, and criticized her work.  All of these allegations, by their nature, do not involve harassment that is related to Plaintiff's disability.  In fact, Plaintiff did not recall [the supervisor] ever saying anything negative about her disabilities . . . At most, Plaintiff has alleged a complicated relationship between herself and her supervisor.  However, this is not actionable under the ADA."); *Caprio v. Mineta*, No. CIVA 04-5805 MLC, 2007 WL 2885815, at *8 (D.N.J. Sept. 27, 2007) ("The incidents outlined by plaintiff . . . show nothing more than a poor relationship between plaintiff and his supervisor, and plaintiff has not asserted any facts that would allow a jury to conclude that [the supervisor] harassed him because of his disability"); *accord Buffa*, 56 F. App'x 575–76 ("[The plaintiff] alleges that [her superior] harassed and subjected her to a hostile work environment due to her Chronic Fatigue Syndrome and because [he] perceived her as having AIDS.  To support these allegations, [the plaintiff] points to the fact that [the superior] asked her harassing questions about her need to work a modified schedule and take time off, [he]

targeted her for reprimand for wearing a denim dress to work, and [he] subjected her to a hostile disciplinary proceeding regarding what [he] believed to be an unexcused absence from work . . . [The plaintiff] has set forth evidence demonstrating that her relationship with her superior, Hoyle, was poor; however, [she] has failed to assert facts that would allow a reasonable jury to find that [her superior] harassed her because of her disability.").

*Walton v. Mental Health Association of Southeastern Pennsylvania* and *Barclay v. Amtrak* are instructive. In *Walton*, the plaintiff, who suffered from depression, took several extended absences due to her disability. 168 F.3d at 664–65, 667. The plaintiff argued that she was subjected to a hostile work environment on the basis of her disability because her supervisor told her she would be fired if she did not attend a ceremony for work, told her she was "manic-depressive," and called her ten days consecutively when she was first hospitalized, asking each day when she would be returning to work, among other things. *Id.* at 667 n.4. The Third Circuit disagreed. "Although it is clear that the relationship between Walton [the plaintiff] and Meek [the supervisor] was poor, Walton has not asserted facts that would allow a reasonable jury to find that Meek harassed her because of her disability. The fact that Meek's behavior toward Walton may have been offensive does not indicate that it was based on Walton's disability." *Id.* at 667; *see also Barclay*, 435 F. Supp. 2d at 449 (noting that the Third Circuit rejected the argument that "any time a supervisor harasses an employee for absences that the employee claims were caused by a disability, it constitutes harassment because of the employee's disability" as an overly "broad view of hostile work environment").

Likewise, in *Barclay v. Amtrak*, the court held that the plaintiff "ha[d] not raised a genuine issue of material fact that his disability, as opposed to several other potential reasons, was the basis of the conduct." 435 F. Supp. 2d at 449 ("When viewed as a whole, the record in

this case does not reflect that Barclay was harassed because of his disability, i.e., because of his irritable bowel syndrome.").  During his deposition, the plaintiff could not recall any statements that his supervisors made that indicated he was discriminated against on the basis of his disability, and the testimony of the plaintiff and his coworkers "indicate[d] that [the supervisor] was hostile to Barclay not because of Barclay's IBS per se, but because he felt Barclay was taking too many days off, irrespective of his disability." *Id.*; *see also McCall v. City of Philadelphia*, Civil Action No. 11-5689, 2013 WL 5823873, at *28 (E.D. Pa. Oct. 29, 2013) (concluding that the record showed that the "animus towards Plaintiff was as a result of his excessive absenteeism," and that "he was not subjected to any harassment or hostility based on either of his actual disabilities—his knee impairment or his depressive and anxiety disorders" because, among other things, "[a]t least one of the absences for which Plaintiff was disciplined was entirely unrelated to any disability"); *accord Mercer*, 26 F. Supp. 3d at 444–45 (granting employer's summary judgment motion and finding that the plaintiff had not shown that he was harassed because of his disability where the plaintiff "claim[ed] to be disabled due to his diabetes, high blood pressure, and high cholesterol—*not* due to his weight or obesity" and the plaintiff alleged that the supervisor harassed him by "frequently curs[ing] at him, call[ing] him 'fat,' and ma[king] fun of him about his weight").

The same analysis holds true here.  The record surely indicates that there was tension between Hinkle and Campo, and even that Hinkle may have overly scrutinized Campo's work. But Campo has not presented evidence showing that Hinkle was hostile to him *because of his diabetes*, as opposed to his failure to get on board with changes at the company/company policies.  Even if Hinkle was hostile to Campo because he was away from his machine more than Hinkle would have liked, that does not compel the conclusion that he was hostile to Campo due

to Campo's diabetes; rather, the record before us indicates that it was not the amount of times Campo was away from his machine but his failure to notify others before leaving his machine that irked Hinkle, irrespective of the diabetes.  And in one instance where Campo was written up, Campo claims that he was turning on the fans, which is entirely unrelated to his diabetes.

For these reasons, the Court finds that Campo has failed to establish that Hinkle harassed him on the basis of his disability.

> ii.    The conduct was not sufficiently severe or pervasive

In the alternative, even if Campo could demonstrate that Hinkle harassed him because of his diabetes, summary judgment is still appropriate because he cannot show that the harassment was sufficiently severe or pervasive.

Campo claims that Hinkle harassed him by unfairly applying company policy to him (i.e., needing to ask permission before taking a break) (*see* Campo Dep. at 86:8–19, 87:16–23, 130:20–132:19); speaking to him in a "very grotesque manner," as if Campo "was beneath him," like directing him to pick something up "in a very humiliating way" or telling him he could not take his snack without permission (*see id.* at 43:15–46:6, 125:12–21); following him around the plant and "checking [his] work" (*see id.* at 44:15–25, 30:15–23); and embarrassing him in front of his coworkers by yelling "Now get out of here!" at him at the end of a meeting.  (Doc. No. 21-6, Ex. T.)

In *Barclay*, the plaintiff claimed that his supervisors at Amtrak harassed him by repeatedly asking for doctor's notes to explain his absences; wanting him to obtain permission before marking off sick; putting him on speakerphone and allowing other employees to listen when he called in sick; and performing frequent safety and speed checks on him and his locomotive, which they did not do with other engineers.  435 F. Supp. 2d at 448.  The court held

that none of those acts, "either singly [sic] or in combination, were so severe or pervasive as to change his conditions of employment." *Id.* at 451. The court explained:

> The extra safety checks and close supervision understandably frustrated Barclay, who had been doing the job of engineer for many years. However, this extra supervision does not seem to have been so unreasonable, given that Barclay was entrusted with the safety of many rail passengers . . . Even if, as several witnesses have suggested, this extra supervision was an attempt to catch Barclay in a safety violation so as to fire him, it is not 'severe or pervasive' harassment to closely scrutinize an employee performing a potentially dangerous job so as to make him do it extremely carefully.

*Id.* at 452; *see also Martinelli v. Penn Millers Ins. Co.*, 269 F. App'x 226, 230 (3d Cir. 2008) (affirming the district court's grant of summary judgment on hostile work environment claim and holding that "no reasonable juror could find that the alleged scrutiny of [the plaintiff's] work was objectively hostile or abusive").

So too here. Viewing the facts in the light most favorable to Campo, it is clear that Hinkle closely monitored Campo—following him around, spying on him, asking others where he was, and so on. However, given that Campo worked the corrugator, an indisputably dangerous machine, the Court cannot find that Hinkle's close scrutiny of Campo's work somehow amounts to severe or pervasive harassment. No reasonable juror would find Hinkle's behavior to be sufficiently severe or pervasive so as to constitute a change in the terms or conditions of Campo's employment. The Court grants summary judgment on this claim.

## IV.    Conclusion

For the foregoing reasons, the Court grants MAP's motion for summary judgment as to Campo's wrongful termination and hostile work environment claims. However, we deny MAP's motion as to the failure to accommodate and retaliation claims.

An appropriate Order follows.